**LEACO ENTERPRISES, INC., an Oregon corporation, dba Leaco Electric Co., an assumed business name, Plaintiff,**

v.

**GENERAL ELECTRIC CO., a New York corporation, Defendant.**

Civ. No. 87–1026–JU.

United States District Court, D. Oregon.

May 7, 1990.

Charles Paulson, Carl G. Kiss, Portland, Or., for plaintiff.

David P. Templeton, Laura Van Harlingen Potter, Douglas C. MacCourt, Martin, Bischoff, Templeton, Ericsson & Langslet, Portland, Or., for defendant.

## OPINION

FRYE, District Judge:

The matter before the court is the objections of plaintiff, Leaco Enterprises, Inc. (Leaco), to the Findings and Recommendation of the Honorable George E. Juba, United States Magistrate, dated December 13, 1989. Judge Juba recommends to this court that the motion for summary judgment (# 116) of defendant, General Electric Co. (GE), be granted in its entirety. Leaco alleges three claims against GE: 1) the intentional interference with contract; 2) the intentional interference with prospective business relations; and 3) the violation of section 1 of the Sherman Anti–Trust Act, 15 U.S.C. § 1.

## UNDISPUTED FACTS

Leaco is an Oregon corporation located in The Dalles, Oregon. Leaco is in the business of electrical contracting, i.e., performing electrical services for residential and commercial sites. The shares of Leaco are owned by Laurel and Wayne Lease. Leaco qualifies as a small, woman-owned business in a labor surplus area under the regulations of the Small Business Administration (SBA).

GE owns 91.9% of the shares of Canadian General Electric (CGE). In 1983, GE transferred its hydroelectric turbine manufacturing equipment and technology to CGE. Since that time, GE has purchased hydroelectric turbine equipment from CGE, and CGE has used the installation services of GE when CGE has had contracts for hydroelectric work in the United States.

On June 3, 1985, CGE was awarded a contract by the United States Army Corps of Engineers, under which CGE was to act as the prime contractor on a project to refurbish hydroelectric generators at the John Day Dam. On June 13, 1985, personnel of CGE and GE met to discuss the working arrangement between the two corporations in general and with respect to the project at the John Day Dam. After that meeting, Edward Feuerstein of GE and Merritt Gordon of CGE disagreed regarding the extent of the consensus, if any, which was reached at the meeting and whether they had reached any agreement with respect to the project at the John Day Dam. Throughout July, 1985, the senior managers of GE and CGE continued to dispute whether GE or CGE would be responsible for the installation work for the project at the John Day Dam.

On July 22, 1985, Bill Corp, a manager for CGE went to The Dalles, Oregon to find a labor broker for the project at the John Day Dam. Corp contacted Leaco, which submitted proposals to Corp on July 24, 1985. On August 1, 1985, Corp called Leaco to advise Leaco 1) that it had been selected as a subcontractor for the project at the John Day Dam; 2) that CGE "accepted Leaco's Proposal # 1 with a few clarifications and modifications as discussed via phone;" and 3) that a purchase order with the "Terms of Reference" would be issued on August 6, 1985.

On August 6, 1985, Corp sent a letter to Leaco which listed terms of the proposal accepted by CGE. The letter concluded:

I believe the above represents our 1 August 1985 discussion. Would you reply by return mail your agreement and acceptance of these terms which will form the basis of our agreement.

This agreement may be cancelled by either party for any reason with thirty days written notice. All costs incurred or accrued to that point would then become payable. No penalties would be applied or considered from either party.

Exhibit 30 to Defendant's Motion for Summary Judgment.

Meanwhile, also on August 6, 1985, John A. Urquhart, Senior Vice President of GE, telephoned William R.C. Blundell, Chairman of the Board and CEO of CGE. Neither man was aware that CGE might have entered into a contract with Leaco, or that Leaco was a small, woman-owned business located in an area with a surplus of labor. Urquhart instructed Blundell to have his managers resolve their differences with the managers of GE regarding the contract for the project at the John Day Dam, stating that the installation work should be done by GE. Blundell agreed to follow Urquhart's instructions.

On August 13, 1985, Leaco received Corp's letter of August 6, 1985.

On August 16, 1985, Corp and Al Driediger of CGE, and Feuerstein, Welton Francis and Dick Dickens of GE met at the airport in Toronto, Canada. The employees of GE informed the employees of CGE that the installation work for the project at the John Day Dam was to be done by GE. Corp then informed the employees of GE that he had already sent a purchase order to Leaco. Corp then called Leaco to cancel GE's contract with Leaco. Later that day, Laurel Lease from Leaco sent Corp a letter advising Corp that Corp's letter of August 6, 1985 correctly stated the terms of the agreement, and that Leaco accepted the terms. Lease backdated the letter to August 14, 1985.

## APPLICABLE LAW

■ When either party objects to any portion of a magistrate's Findings and Recommendation, the district court must make a *de novo* determination of that portion of the magistrate's report. 28 U.S.C. § 636(b)(1)(B); *McDonnell Douglas Corp. v. Commodore Business Machines, Inc.,* 656 F.2d 1309, 1313 (9th Cir.1981), *cert.*

*denied,* 455 U.S. 920, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

On a motion for summary judgment, all reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens,* 533 F.2d 429, 432 (9th Cir.1976). Where different inferences can be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of N. Am.,* 638 F.2d 136, 140 (9th Cir.1981).

## ANALYSIS AND RULING

### 1. *Antitrust Claim*

As a matter of law, a parent corporation cannot conspire with its wholly-owned subsidiary. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 777, 104 S.Ct. 2731, 2744, 81 L.Ed.2d 628 (1984). Where the subsidiary is not wholly owned, the court must determine whether the parent and subsidiary share a unity of purpose in order to determine whether there was a conspiracy. *Aspen Title & Escrow, Inc. v. Jeld–Wen, Inc.,* 677 F.Supp. 1477, 1486 (D.Or.1987) (Redden, J.).

The court may consider various factors in determining whether corporations share a unity of purpose: 1) the legal relationship between the corporations; 2) the makeup of the board of directors of the subsidiary; 3) the corporate purposes of each of the corporations; and 4) the amount of autonomy exercised by the subsidiary.

In his Findings and Recommendation, Judge Juba concludes that GE and CGE share a unity of purpose despite evidence that CGE has few direct ties to GE; that GE has a minority of members on the board of directors of CGE; that CGE operates with sufficient automony to enter into contracts of up to ten million dollars without the prior authorization of GE; and that GE has approved the employment of twelve out of CGE's 14,000 employees. In his Findings and Recommendation, Judge Juba also finds, as a matter of law, that the relationship between GE and CGE is to the benefit of CGE.

The Ninth Circuit has stated that "[t]he district judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Sorosky v. Burroughs Corp.,* 826 F.2d 794, 798 (9th Cir. 1987). The first issue is whether the evidence presented by the parties creates a genuine issue of material fact as to the unity of purpose between GE and CGE because summary judgment is inappropriate where different inferences can reasonably be drawn from the evidence.

GE contends that since it owns 91.9% of the shares of CGE, this is a *de minimis* variation from total ownership and therefore establishes the unity of purpose of the two corporations as a matter of law. In *Aspen Title & Escrow, supra,* this court found that the 97.5% ownership by a parent corporation of a subsidiary was a *de minimis* variation from total ownership, but that 60% and 75% ownership by a parent corporation of a subsidiary does not preclude the subsidiary from conspiring with the parent corporation. 677 F.Supp. at 1486. In its *Aspen* decision, the court adopted the *de minimis* principle from *Sonitrol of Fresno, Inc. v. AT & T Co.,* 1986–1 Trad.Cas. (CCH 67,080), 1986 WL 953 (D.D.C.1986).

In *Sonitrol,* the court found that subsidiaries of which AT & T had 23.9% or 32.6% stock ownership did not necessarily share a unity of purpose with AT & T. However, the *Sonitrol* court followed the recommendation of a special master that subsidiaries should be treated as wholly-owned subsidiaries where, under the law of incorporation

of the subsidiary, AT & T owned a sufficient percentage of stock to force a merger of the subsidiary into AT & T. Thus, the *Sonitrol* court granted summary judgment against the claims concerning subsidiaries in which AT & T owned 90% of the stock.

CGE is incorporated under the laws of the country of Canada. Those laws provide that a corporation which owns 67% of a subsidiary may force the merger of the subsidiary. Compulsory Acquisitions Title, Business Corporations Act, 1982 [Ontario], Part XV, §§ 186 *et seq.;* Canada Business Corporations Act, §§ 199[1], 177[5], 2[1]. Thus, GE, which owns 91.9% of the stock of CGE, could force CGE to merge with it. The court finds that GE's ownership of CGE is a *de minimis* amount less than 100%, so that the *Copperweld* rule should be applied to hold that GE and CGE share a unity of purpose as a matter of law.

Therefore, the court does not adopt the reasoning of Judge Juba as to his recommendation regarding the antitrust claim, but the court adopts his recommendation that as to the antitrust claim, CGE and GE share a unity of purpose for the reasons stated above. Accordingly, GE's motion for summary judgment is granted as to Leaco's antitrust claim.

2. *Interference With Contractual or Economic Relations*

■ Under the laws of the State of Oregon, the elements of a claim for the intentional interference with contractual or economic relations are: 1) the plaintiff had a contract or a reasonable expectancy of economic advantage; 2) the defendant knew of the contract or expectancy; 3) the defendant intentionally interfered with the contract or expectancy; 4) the defendant's means or motive were improper or wrongful by some measure beyond the fact of the interference itself; and 5) the plaintiff was damaged as a result. *Straube v. Larson,* 287 Or. 357, 361, 600 P.2d 371 (1979); *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.,* 283 Or. 201, 209–10, 582 P.2d 1365 (1978).

For the purposes of this motion, GE concedes that Leaco had a contract with CGE and that Leaco sustained damages when CGE cancelled the contract. However, GE disputes Leaco's contention that the contract was not terminable at will.

In his Findings and Recommendation, Judge Juba concludes that whether or not the contract was terminable at will, Leaco cannot show that GE knew of Leaco's contract or that GE intended to interfere with Leaco's contract or economic advantage. However, in his Findings and Recommendation, Judge Juba incorrectly focuses on the events of August 6, 1985, rather than the events of August 16, 1985. Although Urquhart of GE and Blundell of CGE agreed on August 6, 1985 that GE would perform the installation work for the John Day project, the undisputed evidence is that the decision to terminate Leaco's contract was made at the meeting between managers of GE and CGE on August 16, 1985, at which time Corp disclosed that he had given a contract to Leaco, a small, woman-owned corporation.

Based upon this evidence, a jury reasonably could find that GE knew of Leaco's contract, and that GE intended to interfere with Leaco's contract. Since the court declines to adopt the Findings and Recommendation on this point, the court must consider the other grounds for summary judgment raised by GE.

■ The parties argue at length whether the contract between CGE and Leaco was terminable at will. GE contends that if the contract was terminable at will, GE cannot be held liable for inducing CGE to terminate the contract. However, the parties to a contract at will have no less an interest in the integrity and security of their contract than do any other contracting parties, and third parties may not properly interfere with such a contract. *Lewis v. Oregon Beauty Supply Co.,* 302 Or. 616, 620–21, 733 P.2d 430 (1987).

■ GE contends that there is no evidence that it had a motive or used means which were improper or wrongful by some measure beyond the fact of the interference itself. There is no evidence in the record that GE had any malice or ill will toward Leaco. However, Leaco has pro-

duced evidence sufficient to create an issue of fact as to whether GE used wrongful or improper means to cause CGE to terminate Leaco's contract.

The cases decided under Oregon law have described in broad terms the wrongful or improper means which will support liability for interference with contract. The court in *Top Serv.* stated that means or motives may be wrongful by reason of a statute or other regulation, a recognized rule of common law, or an established standard of a trade or profession. 283 Or. at 209–10, 582 P.2d 1365. Also included among improper means are violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation or disparaging falsehood. *Id.* at 210 n. 11, 582 P.2d 1365.

Leaco has produced evidence which could support a finding that GE induced CGE to terminate Leaco's contract on August 16, 1985 by means of threats against the jobs of the employees of CGE who were present at that meeting. There is also evidence which could support a finding that GE considered only its own benefit and not the best interests of CGE in directing CGE to terminate Leaco's contract. As a controlling shareholder in CGE, GE has a fiduciary duty to consider CGE's interests in such transactions. Furthermore, there is an issue of fact whether CGE had a duty under the policies or regulations of the SBA to prefer the use of small local or woman-owned subcontractors for any portion of its contract with the Corps of Engineers.

Therefore, the court declines to adopt the Findings and Recommendation with respect to the claims for intentional interference with contractual or economic relations. GE's motion for summary judgment is denied with respect to Leaco's claims for interference with contractual or economic relations.

### CONCLUSION

The court declines to adopt the findings of Judge Juba as to the antitrust claim, but adopts his recommendation as to the antitrust claim. The court declines to adopt

the Findings and Recommendation with respect to the claims for intentional interference with contractual or economic relations.

GE's motion for summary judgment (# 116) is granted as to Leaco's antitrust claim and denied as to Leaco's claims for interference with contractual or economic relations.